Please call the next case. Next case, 5-12-0182 W.C. Kanderson, I.F. Radecka v. Workers' Compensation Comm'n. Mr. Short. Good morning, good afternoon. Afternoon. If anybody learned anything from that it would be great. I learned something. It's good to be up here again. I haven't been up to the Workers' Compensation panel in about eight or nine years. This case is substantially simpler, I think, than the prior ones. We have a bit of a catch-22, which is an interesting scenario. And I won't deny for a moment that there are portions of it which need explaining because otherwise a person would wonder why I bothered to file the claim. What we have is a woman who, and I know the court has read the records, but I feel compelled just to give a brief summary of what transpired because it's essential to the issues of notice and the issues of data manifestation. Kasha, it's easier just to call her by her first name, Kasha, was employed by the respondent for about three years from March of 2006 to January of 2009 as Director of Vocational Rehabilitation at their facility. No workers' compensation claims, no restrictions on her activities, no medical care during this time. In January of 2009, she decides to step down from being a full-time therapist, or Director of Therapy, to being an actual therapist. And this is important. In January of 2009, she is not seeking any medical care. She will acknowledge she's had a history of having some neck problems, but she's not received any significant medical treatment at all. In fact, all she gets is a little massage therapy once in a while. But in January, she goes down to being a full-time therapist. And here's where it gets interesting because one of the witnesses for Kasha, for the petitioner here, is in fact an employee of the respondent and is a doctor who works for the respondent. And she witnesses the daily work activities as a full-time therapist, which is 85 percent hands-on. And for billing purposes, the physical therapist gets paid more for actual hands-on labor than for other physical therapy activities. So 85 percent of her work activity is lifting patients, putting patients in chairs, taking patients off of toilets, putting them into beds, and taking them through physical therapy. Part of that requires her to put a gait belt on them and lift them, put them in the chairs, and then take them down a hallway through a heavy 100-plus pound metal door, which is a firewall between wings of the building. Counsel, is anybody disputing her death? Well, not really, but here's why it's critical. Because all of these activities are a foundation of all of the testimony. This is the kind of thing which will cause an asymptomatic back to fall apart. But the case didn't really turn on that. As I understand it, the real crux of the issues are, to be candid or blunt, is that the claimant's testimony was allegedly inconsistent with the medical records over times. She went to one doctor. She didn't mention that incident. There's no mention of July 23, 2009 accident in the patient notes in any of the positions. And I know you'll have an answer, but you've got that. You've got two doctors on your side, as I look at the record, Taylor and Carrazzo. Bernardi said it's not causally related. Well, actually, there's more than Taylor and Carrazzo. There's also Dr. Kennedy. First off, Dr. Taylor does more IMEs for respondents. So let's look at who he is. He's a middle-of-the-road guy. He's a Harvard-trained surgeon. Dr. Bernardi, in another case called Ferris versus Unity Health, testified that a gentleman weighing 660 pounds, that weight was good for his back because it keeps everything stabilized. This is a man with no credibility. Can we take judicial notice of that? Well, no, but you should take judicial notice of who Dr. Bernardi is. How do we do that? By his testimony. All you have to do is read it. He says she doesn't even need surgery. And this is a lady who has an annular tear, who has multiple herniated discs in her neck and her low back. Dr. Kennedy says she needs surgery. What do you make of the commission believing Dr. Bernardi? Well, if you read the commission's decision, you'd be hard-pressed to understand who they believe because they didn't write a decision. They simply rubber-stamped the arbitrator. By the way, this case was decided in the middle of arbitrator Nalewski's last days as an arbitrator and all the turmoil we faced in front of the commission. And we have to see this in that reality. We have to. Because what we have here otherwise... How do we do that? Are we doing that in the record? How do we go outside the record? You don't need to. You don't need to. All you have to do is look at the record. Dr. Kennedy says she needs surgery. Dr. Feinberg says she has significant problems. He's given her multiple injections. Dr. Prather has. Dr. Taylor has. Dr. Carrazzo, who works for the respondent, has. The only one who says she doesn't need this kind of surgery is Dr. Bernardi. If you want to talk manifest way, just pile it up. That literally matters. But what about the inconsistencies in her medical history? There really aren't. Because here's what. The inconsistencies are she doesn't say much. I'll give you a perfect example. In December, after she last works there, in December, she's asked by Dr. Kennedy, and it's in her record, it's on page 521 of the record itself. She's asked, is this work related? And she doesn't answer yes and she doesn't answer no. She says unsure. She doesn't know. She could have easily checked yes or no. This is five months or three months at this point after her last employment. She doesn't check yes. She doesn't check no. She doesn't know. She doesn't know. Here's the point. She doesn't know. When she went to the emergency room on August 3rd, 2009. Right. She did not report the July 23rd, 2009 incident. Right. She said she heard herself lifting a heavy medical charge. Well, was she not lifting the medical charge of work or what was she lifting the medical charge of? Well, she's lifting all kinds of things. And that's actually the point. How do I, and I'm not being facetious with the court, but I really, here's the problem I was presented with as her petitioner's counsel. We could allege July 23rd is a date of manifestation or a date of injury, but the problem is she's already scheduled for an MRI for July, the next day. So how do I say that that's the day that she finally broke down? She was already scheduled for an MRI. But she said she heard her lifting a heavy medical charge. Yeah. So how are you telling us now she had no idea how the injury happened? Well, she also said she heard her lifting a patient out of the toilet, off of the toilet. That's in there too. The bottom line is no one event caused any greater pain than the other events. It's all the lifting. It's the daily lifting, transferring people from toilets. This is just one more in a series of events. I listed the July 23rd event because that's the day she's taking a person off the toilet. But I can't in good conscience say that is the singular event because she already scheduled for an MRI the next day because she's already under care. So she's under care because the moment she transfers from a non-lifting occupation to lifting people every single day is when this isn't lifting like I would do in my office. This is lifting human beings for a small immigrant Polish girl to be lifting all these people. And I bring up her ethnicity for a reason. She's not from here. I realize it's her obligation to understand what the law is and whether or not she should report an injury. I get that. But the moment she switches jobs, which is January 2009, and she's required to do all this heavy lifting, this is when the breakdown begins. So I can't in good faith say, yes, July 23rd is the only singular event or lifting a chart is the only singular event because she's already in this process. She's already scheduled for an MRI the next day. Well, I can't rightly pick September because she wasn't working in September. I can't list the date of accident when she's not actually employed. But in September she talks to her boss and she with tears running down her face and he's a nice man. He acknowledges, yes, she did have this conversation. She says, lifting all of these people, I can't do it anymore. I am breaking down. And he acknowledges that they have this conversation. So at that day you could say, well, that's the day that she becomes aware of the cause of the accident. But is she aware of the causation of the accident, of the injury? Because the law says, and I quoted the case, that it's cause and fact with knowledge of causation. The question as to manifestation of an injury occurs when the fact of the injury and the causation, it's conjunctive, become plainly apparent to a reasonable person. And the connection to the workplace. Right. So at that point in September when she's telling her boss, I can't physically lift these people anymore, if you're going to assume that she should have known there was cause and effect there, then you should assume he should know. Well, let's set that aside. Do you think it's her who was the obvious one you started out to address, and that is the commission found against her? Oh, yeah. I don't deny that. Sure. So tell us simply why that decision we should substitute our judgment for that of the commission. Okay. And I'm glad you brought that up. Let's work backwards from the idea of Dr. Bernardi. I think the concept of Dr. Bernardi who they're going to rely on, who says she doesn't need surgery, when every other doctor in the case says she's got surgery, Kennedy does. He proposes it. It's in his records. Dr. Taylor does. And this is no slouch, Dr. Taylor. He says it. Bernardi, if you're familiar with workers' compensation, yes, and I think it needs to be a miscarriage of justice not to know who he is. And I even bring it up in the depositions. He is a boss. He works for them, plain and simple. He says he doesn't need surgery. Right there you should question whether or not they really weighed the evidence properly. When you have Carrazzo, who works for them, saying, yes, she's disabled and probably needs surgery. Hegde, who was the prior doctor. Kennedy, who says it. On 9-10-09 he says it. Dr. Feinberg, who's giving her injections, and Dr. Taylor, the Harvard trained doctor who does these kinds of surgery all the time, they all say she needs surgery. And the commission, and I'll read it, they say they're going to give more weight to Dr. Bernardi. Right there I question, did you really weigh the evidence? Because if you did weigh the evidence, manifest weight of the evidence, there's no way anyone who's been doing this for this long could go with Dr. Bernardi. It just doesn't make any sense. So right there you start to question, what was the analysis done? And I don't know what the commission did, because their decision starts here and ends there. It's a rubber stamp of the arbitrator in Lebsky's decision. I don't know what rationale they applied at all. So I don't know. It's not like this court where I can look back and see the reasoning that comes down with the decision. I don't have that benefit. So what we have is a lady who clearly is doing a job that the credible doctors all say is the kind of thing that can either cause or aggravate a condition such that she can't become employed anymore, at least in that position. Based on that alone, we know the decisions against the manifest weight of the evidence. But if we go backwards to this issue of notice and the issue of date of manifestation, the date of manifestation is the last day she worked. So then why did you file July 23rd? Well, why pick any day? It's the day her body's breaking down. That was a specific day. She talked with her employer about the days of month on September 1st. She testified, didn't she, that she didn't realize that her condition was work-related until March of 2010? Yes. And she was talking with an attorney acquaintance and realized she might have a workers' compensation claim. That's exactly what happened. In fact, in December she wasn't sure, which is why she checked. So, I mean, why wouldn't that be? I mean, if it's when a reasonable person realized that her conditions weren't related. Yeah, I suppose we could have listed that, but that's actually nine months after. Yeah, it's nine months after she's last worked, and I'm fighting a whole different fight up here. And what we do know is I decided what I had to do was pick a specific day that I could account for. Isn't the problem here, though, Mr. Shorten, you can't pin this down to any particular thing that happened at work? That's exactly correct. So it got tried as a repetitive trauma claim. That's correct. And really it's not your typical repetitive trauma claim where somebody's doing the same thing over and over on a daily basis, and it didn't get fit by the arbitrator into any myth. It is a square peg in a round hole. Right. It is. And trust me, Your Honor, I weighed that out a long time before I picked the date of accident, and I didn't want to pick a day where she wasn't working, and I needed to pick the day that I knew that one particular event exacerbated her symptoms, and that was one. So we picked that day, the day we know she's working, that day we know she was doing an activity that she typically does that we know illustrates exactly what she's going through. And we know that the employer knows about that because on September 1st she's standing there crying with him saying, I can't do this anymore. So he has notice, and he has notice within 45 days of that event. So that's the day we picked. So we satisfied the notice, we satisfied the manifestation date, and you're right, Your Honor, it comes down to do you believe Dr. Bernardi in the one hand or every other doctor in the case? Well, it's really not whether we believe Dr. Bernardi. Because now the problem is all this got thrown to the trier of facts. The commission, the commission adopted the arbitrator's decision and if there is sufficient evidence to support that and there is, we have conflicting medical evidence, even if it's one against many or whatever, there's conflicting medical evidence. Case after case after case we've said that's the commission's decision. Absolutely, Your Honor. But I would also, as I've been before you many, many times, I would also say that it doesn't alleviate you from the responsibilities of reviewing that analysis of that evidence and saying, is this really credible or not? It doesn't really make any sense. Does Dr. Bernardi really make any sense? Of course he doesn't. The MRIs show obvious herniations and anterior tears. Every other doctor in the case. The fact that they say, oh, I'm sorry, my time. Is this my time? You have one minute. I got the red one. It's been a while. It's not as though I'm saying that the commission doesn't have a basis within their decision. What I'm saying is if you actually analyze it, which we don't know the commission did, but if you actually analyze the evidence and you weigh it, no reasonable person would ever take Dr. Bernardi's position. Read his deposition. Read the records. Read Dr. Taylor. If Taylor's actually done this physical job, they've looked at these. So for Bernardi to be right, every other doctor and the radiologist all have to be wrong. And that's manifest weight. And the weight so profoundly falls in our favor. So profoundly that the fact that they chose to abide by this reasoning, I don't understand. But an analysis of it is exactly what this court is for. To say, yes, this is one of those rare instances where the weight is so profoundly on one side that we simply cannot give Dr. Bernardi the same credit. And for that reason, we ask that you rehearse. Thank you. Counsel? Counsel? You may respond. It's the commission. My name is Roby Jaberonik. I'm here on behalf of the appellee. Commission? Therapy. I'm pardoned. My apologies, your justices. I'm here on behalf of the TheraTherapy. Like you guys said, the standard review here is manifest weight. I believe there is sufficient evidence in the record to support the commission's decision that it was not against the manifest weight of the evidence. So what do we really have here? I believe there's a lot of red herrings being thrown out. Well, it seems you've got one doctor that says it's degenerative disc disease. That's the condition of Bill Dean. It's not related to any traumatic events or repetitive events of employment. Is that correct? That is correct. And you have these other physicians who are saying that there's medical evidence of an incident of the condition that could be traumatic. I think we need to parse that out because I believe there's only one causation opinion. There's two. One actually in the medical records. One taken via deposition. Dr. Kennedy, who was the treating surgeon, who first I believe made the recommendation, never provided a causation opinion. You ask yourself why? Because there was nothing in the record to support a causation opinion. How many causation opinions did the claimant have? I believe he has two. He has two. Okay. So he's got two. You have Dr. Bernardi. I think of all the doctors he saw. Yeah, but you addressed his argument that Dr. Bernardi's testimony was obviously flawed. And he came through with a number of reasons why he felt Bernardi's credibility, his testimony was impeached. What's your response to that? I completely disagree with him. I think he tried to throw out prior testimony that wasn't in the record. Yeah, set aside that. We're not looking outside the record here. The old cases. Yes. But he seemed to have some reasons why he felt that his opinions in this case were flawed. What's your response to that specifically? My response is Dr. Bernardi's a neurosurgeon. I mean, look at it. He keeps weighing, oh, he puts Dr. Taylor on a pedestal because he's a Harvard grad. He's a general orthopedic surgeon. We've got Dr. Bernardi, who's a neurosurgeon. I mean, I think that he's very qualified to make these assessments. He reviewed the MRI scan and the CT scan. I mean, if this lady was in terrible pain like he wants to present, I think she might want to pursue surgery. It was clear that she didn't need surgery. There was doctors that said she didn't need surgery. I think the first physician she saw, if I pronounce his name right, Dr. Hedgie. I believe it was Petitioner's Counsel's testimony that he recommended surgery as well, but he didn't. And I believe Dr. Bernardi, being a board-certified neurosurgeon, stands just as high, if not higher, on the board of credibility than does Dr. Taylor, who was specifically hired by Petitioner's Counsel. So again, he didn't go to Dr. Kennedy. He hired Dr. Taylor almost a year later, who provides his opinion. He's a hired gun. What about the other doctor that gave him the causation opinion? The other one was a friend, co-employee-slash-friend, who had been working with her. Why didn't that doctor put it in the records? Why did he have to take the testimony and drag it out of her? I mean, look at this lady's credibility. I mean, she's the director of rehab. The director of rehab that testified during arbitration stated, everybody knows that if there's a work-related injury, then you must report it to me, and thereafter I'm going to do an electronic document, such as a Form 45, filling it out. She was in his position. She knows the importance of medical history. She's a therapist, for heaven's sake. She knows the importance of notice. She didn't provide it. And then there was this issue of when was the manifestation date? Like Justice Stewart said, you could have alleged that March date when she clearly stated that she knew. Then there's evidence in the record where she talks about in August 2009 that she knew her pain was being aggravated by her work. She stated that. I mean, there was countless inconsistencies. I know, Justice Hudson, you noted that in the medical records there were inconsistencies. Let's take a look at – I read the transcript. I read her testimony in conjunction with the briefs and the records, and I mean, it is consistent, inconsistent. I mean, for her to say – I think this is – for her to say that her work was the only cause of her problems, and then there's evidence that she And to say that that didn't cause her any pain? Why was she going in for the MRI before the alleged accident? That's a good question. Because she was symptomatic all along. Did you unearth anything in the medical records? I think there was something in there that she had a prior horseback riding incident about 20 years previous. And I don't know if you can take judicial notice of this, but I mean, I think it's apparent to most people that riding horsebacks, riding on a horse will aggravate your arm, possibly neck, shoulders with your arms, can tear up your rotator cuff tear. You know, we get a lot of invitations for judicial notice. He wants me to notice what Taylor said five years ago. You want me to notice what somebody did on a horseback 20 years earlier? This is unusual. But for her to testify in front of an open court under oath that her working with a therapist and performing her therapy duties was the only cause of her pain, it's just... To which I will not take judicial notice. Yes. I think it's unreasonable. The physicians who testified to causation didn't say that what they testified to was her work likely aggravated her degenerative dysplasia. That is fair. That is a fair statement. I mean, everybody agrees that she had degenerative disc disease and back problems before she began working with patients. I agree with that. Yes, I do. And I guess... If you aggravate a pre-existing condition, can't she recover on that basis? If it's a permanent one. This could be a temporary flare-up, such as a sunburn, where you have the sunburn, it's there, you hit it, it increases, 10 minutes later it's back to normal. That's a fair analogy. Sunburn and a herniated disc. Right. I mean, she had the herniated disc. I think it was clear that the herniation was post the 7-23-09 alleged incident. And I know Petitioner's Counsel said, hey, we're looking for dates. He didn't know the date. She said 7-23-09. That's the date they're going to stick with. I mean, that was their call. They could have amended this application and chose a different date. And the problem is, it's just... Kind of hard to talk to somebody and pick a manifestation date. They're all over the board in all these cases, aren't they? Right, but I mean, if there was an actual incident, she said it. She said 7-23-09. There was an incident that occurred. She said at the ER hospital on August 3rd of 09. There was an incident that occurred. She didn't say work. She saw all these doctors and not once did she mention her work activities. And again, don't forget, she was the director of physical therapy. She was well-versed in what needed to happen when somebody reported a work incident. Not to forget that she knows the importance of history. Somebody provides her when they come in for therapy. I saw numerous inconsistencies throughout the record, which I just had a hard time believing this lady at all. All right, so you're saying inconsistencies in the medical record, I think Bernardi should be enough, right? Yeah, I believe it's sufficient enough to support the commission's decision. I certainly believe that, and you guys, it's in the province of the commission to judge the credibility of the witnesses, to determine the way to assign to the testimony and resolve conflicts of evidence. And I believe that the rational trier of fact, including the arbitrator, the three-commission panel, the circuit court judge, all concluded that the commission's decision was not against the manifest weight of the evidence. I mean, that's arbitrators, one, three panel commissions, four, circuit court judges, five. I'm not a trier of fact, but I've read this. I agree with them, and I'm hoping you guys will do the same. Is there any questions that I could? I don't believe there are. Thank you. Thank you. Counsel, you may reply. Just to ask a quick question. I mean, he did make a point in there that we talked about Dr. Bernardi versus the other doctors when he spoke earlier. However, that wasn't the only basis for arbitrator Galefsky's decision. He does say that her testimony is inconsistent with the medical records. I think in particular he made up the fact that she never mentioned to her treaters anything about any work injury. Right. So it's that and Bernardi. And actually, that was one of the only things that I wanted to address because, well, first off, let me correct one small mistake. To call Dr. Taylor a general orthopedic surgeon is a great disservice to him. That's like saying that I'm just an average work comp liar because I'm not. He is a great orthopedic surgeon in all he does is spines. And so his qualifications to address the issues of causation and need for treatment easily match, if not far exceed, Dr. Bernardi's. And also, the issue of causation as to work, Dr. Kennedy doesn't address that. But he does address the need for surgery. And Kennedy is a well-known, long-time neurosurgeon who says that she needs surgery. And so if you're going to start with Bernardi, leaving the issues of causation and liability out, leaving the question of does she need surgery, all of the real weight is on our side. All of it. And he talks about me hiring Dr. Taylor. Well, an IME is the same thing. So I'm not concerned about that. Any rational person who looks at an MRI and says, well, there's multiple hernia, disc, and annular tears, and then says she doesn't need surgery. It's her option whether she has it or not. But going back to this concept, this is the concept that bothers me more. And I actually wrote the word never down. The idea that there's inconsistency. No, there's no inconsistency in her tests, in her medical records. I've heard what you just said, Your Honor, about inconsistencies. No, there's no inconsistency. The consistency is she doesn't report a work accident. That's not an inconsistency. It would be an inconsistency if she told Dr. Kennedy one thing and Dr. Taylor another and Dr. Bernardi a third. She never tells anybody anything about work because these are just daily activities. It's not our classic example of picking up something and pop out. This isn't that. So no, in fact, it's the exact opposite of that.  She is consistently not telling them it's work-related. And, in fact, in December she says, I don't know if this is work-related. She's asked, is it work-related? In a form, that's the page 521. And she says, I'm unsure. She doesn't know. So that's not inconsistent. It's not until she sits down with a lawyer in Chicago, seven, eight, nine months after she last works in March, and that lawyer says, you know, I think this might be work-related. That lawyer says, call Keith. I end up with a case. I sit down, I do the analysis, and clearly her employment is the kind of thing which will aggravate the degenerative spine. Now I look at it. How do I pick a date? Well, there's a date she remembers that occurring, and there's the date that she told her employer, I can't physically do this anymore. They're clearly within 45 days. But, you know, do I have to say picking a person off the toilet? I guess I could say picking them off the floor or moving them to the bed. It doesn't matter. It's just constant, every day, lifting several. She works with 12 to 15 people, lifting hundreds of pounds of people. So are her records inconsistent? No, they are not inconsistent. Are they absent of a history? Sure they are. We never denied that. Never once did I say in the records, she told this doctor this is work-related. She didn't know. And in December, confirmed she didn't know. After she'd seen everybody, she's still saying, I don't know, I'm not sure. And it's not until some lawyer says there might be causation. And there's a last issue on this, and then I will shut up and go home. The last issue is this. What's important is none of the doctors talked to her about causation. Dr. Kennedy's been doing work comp for a long time. Dr. Bernardi has. Dr. Taylor has. They all have. Nobody says to her, well, let's talk about what your job is. And we all know that that's one of the things I do medical malpractice to, is to take a history. That history's never obtained from any of the doctors. So is there an inconsistency? No, not at all. It'd be different if the records jumped from history of accident to non-history of accident. What happened is fairly clear. She clearly injured her back in the line of her employment. This is clearly compensable. We filed at an appropriate date, and the employer was notified within 45 days. For those reasons, we think this decision should be reversed. Thank you. Thank you, Counsel. This matter will be taken under advisement. Written disposition shall issue.